FILED
IN OPEN COURT

MAY 1 8 2012

CLERK, U.S. DISTRICT COURT
ALEXANDRIA VIRGINIA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

BRIGHT IMPERIAL LIMITED,                )
                                        )
    Plaintiff,                          )
                                        )
v.                                      )        Civil Action No.: 1:11-cv-935-LO-TRJ
                                        )
RT MEDIASOLUTIONS, S.R.O., *et al.*,    )
                                        )
    Defendants.                         )

### MEMORANDUM OPINION

Before the Court is Defendants RT MediaSolutions, S.R.O. ("RT MediaSolutions"),

Swiss Media Factoring GmbH ("Swiss Media"), and Walter Olligschläger's (collectively,

"Defendants") renewed Motion to Dismiss for lack of personal jurisdiction (Dkt. No. 108). There

are also three motions to seal before the Court. (Dkt. Nos. 110, 121, and 131). For the reasons

stated in open Court, as well as the reasons expressed herein, the Motion to Dismiss is DENIED

and the Motions to Seal are GRANTED as the relevant documents contain confidential

commercial or proprietary information deemed as such in a protective order to which the parties

have stipulated.

### BACKGROUND

This renewed motion succeeds a prior motion to dismiss for lack of personal jurisdiction.

The Court denied the first motion without prejudice and granted jurisdictional discovery. At the

conclusion of the discovery period, Defendants renewed their motion, and this matter is now ripe

for disposition.

The present cause of action requires the Court to consider the ever evolving personal

jurisdiction analysis within the context of "the modern reality of widespread Internet electronic

1

communications." *Graduate Mgmt. Admission Council v. RVR Narashima Raju*, 241 F. Supp. 2d 589, 595 (E.D. Va. 2003) (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 713 (4th Cir. 2002)). As technology and electronic commerce ("e-commerce") continue to evolve, so must the understanding of due process and the meaning of purposeful availment. The personal jurisdiction analysis in the e-commerce setting is necessarily fact intensive, and each cause of action is unique. The facts in this case, only slightly altered, could result in a different outcome. Here, the Defendants' contacts with both Virginia and the United States as a whole were sufficient to put them on notice that they could be haled into court in this forum. Accordingly, these facts render the exercise of personal jurisdiction appropriate.

Defendants RT MediaSolutions,[1] a Czech Republic corporation; Swiss Media, a Swiss corporation; and Walter Olligschläger,[2] a Swiss citizen, operate or operated the adult content website <red-tube.com> ("red-tube") and the red-tube parent websites.[3] Defendants were issued a German registered trademark for the term "REDTUBE," as well as an International Registration for the "REDTUBE" mark with designations in Australia, Japan, China, Korea, Russia, and Singapore. Plaintiff, Bright Imperial Limited ("Bright"), claims that it owns all of the U.S. trademark rights in the REDTUBE mark, and that the Defendants have exploited Bright's mark within the United States for profit. Like Swiss Media, Bright also uses the REDTUBE mark to provide adult content on the internet, including its <redtube.com> domain name.[4]

---

[1] According to the Declaration of Walter Olligschläger, Swiss Media currently operates the red-tube businesses. RT MediaSolutions formerly operated the businesses but is now going through liquidation proceedings in the Czech Republic and has no assets apart from a small amount of cash. Although RT MediaSolutions is the registrant of the allegedly infringing domain names, Swiss Media is currently the sole owner.

[2] Olligschläger is the managing director and sole shareholder of Swiss Media.

[3] The other parent websites include: <red-tube.cz>, <red-tube.ch>, <red-tube.de>, and <red-tube.at>. These websites designate the Czech Republic, Switzerland, Germany, and Austria, respectively.

[4] So that the subtlety will not be overlooked, the Defendants' domain name is red-tube.com. The Plaintiff's domain is identical, except that it does not use the hyphen; it is redtube.com.

2

Although any visitor to Defendants' site who types the red-tube.com domain name into his browser may preview the website's videos and peruse the website's largely German content,[5] in order to purchase any of the adult content, the visitor must become a registered user. A registered user is required to fill out an online registration form and agree to Terms and Conditions, which are provided in German and not translated. Once registered, a user may purchase content on the website by using "coins," a red-tube created currency. Coins are available for purchase at a rate of €1 per 100 coins. The rate is listed on the website in Euros, and is not converted into dollars. Red-tube sporadically provides "bonus" coins to registered users, at no cost, as a promotional tool. Once a user spends his or her coins to access adult content on the site, he or she has permanent online access to the content. Swiss Media does not personally solicit customers in the United States; however, red-tube does send periodic emails to registered users.

Since 2006, red-tube has accrued more than 1.8 million registered users, and revenues have exceeded 8.1 million Euros. Currently, there are sixteen registered users (less than .001% of total registered users) who provided a Virginia zip code at registration, and 577 registered users (0.03%) who provided an address within the United States. The Virginia users have contributed approximately €1620 in revenues (0.02% of total revenue), and the United States as a whole has provided approximately €64,470 (0.76%). The Defendants have entered into over 16,000 individual video sale transactions with United States residents.

The website also offers opportunities to those interested in making their adult media debut. These website users are termed "amateurs," and they actually create the website's adult media content. In return, red-tube provides amateurs with a percentage of the revenue that Swiss

---

[5] Although the actual adult content on the website is mostly in German, the website displays an American flag icon, permitting the user to translate portions of the German language on the website to English.

3

Media earns when other registered users purchase the amateur's content. Payments to amateurs are made on a monthly basis when earnings exceed €50. Currently, there are no amateurs in Virginia and five amateurs in the United States. These amateurs have uploaded 129 videos, and Defendants have sold these videos approximately 4,800 times and earned approximately €25,813. The amateurs have received a total of €6,453 in payment over the past six years.

Swiss Media also operates what it calls an "affiliate webmaster" program. This program allows affiliate webmasters to show the content from Swiss Media's red-tube site at a domain name operated by the affiliate webmaster. When a user associated with an affiliate webmaster makes a purchase on one of the red-tube parent sites, Swiss Media pays the affiliate webmaster a portion of the revenue from that purchase. To become an affiliate webmaster, a domain name owner need only click the "affiliate" link on the red-tube page, agree to the Terms and Conditions provided in German and not translated to English, and provide payment information. Swiss Media does not exercise any control over affiliate webmasters; however, it does offer a variety of red-tube banner advertisements, some of which are in English, which affiliate webmasters can choose to display on their websites. Some, but not all, affiliates use these banners. Because Swiss Media designates a unique identifier to all affiliate webmasters, it does not keep a record of the domain names being used by the affiliates. Currently, there are no affiliate webmasters in Virginia and only one affiliate who has provided a contact address in the United States. That affiliate received payments into a nondomestic bank account amounting to €79,963. Swiss Media has garnered approximately €227,000 in revenue from users brought to red-tube via this affiliate.

The issue presented to the Court is whether these contacts are sufficient to establish personal jurisdiction over the Defendants.

## ANALYSIS

### I.    Jurisdiction is appropriate in Virginia[6]

When the parties, as here, have conducted jurisdictional discovery, it is the plaintiff's

burden to establish personal jurisdiction by a preponderance of the evidence. *See Combs v.*

*Bakker*, 886 F.2d 673, 676 (4th Cir. 1989); *Brown v. Geha-Werke GmbH*, 69 F. Supp. 2d 770,

774 (D.S.C. 1999). To establish jurisdiction, the plaintiff must satisfy a two-part inquiry,

encompassing both a statutory and a constitutional prong. *See ALS Scan*, 293 F.3d at 710;

*Alitalia-Linee Aeree Italiane S.p.A. v. Casinoalitalia.Com*, 128 F. Supp. 2d 340, 347 (E.D. Va.

2001).

#### a.   The Statutory Prong: Virginia's Long-Arm Statute

First, the plaintiff must show that Virginia's long-arm statute reaches the facts of the

case. Virginia's long-arm statute permits specific jurisdiction when at least one of the statutory

prerequisites is satisfied, and it has been construed to allow jurisdiction to the full extent of

constitutional permissibility. *Young v. New Haven Advocate*, 315 F.3d 256, 261 (4th Cir. 2002)

(citing *English & Smith v. Metzger*, 901 F.2d 36, 38 (4th Cir.1990)). As a result, the statutory and

constitutional inquiry become one and the same. *Id.* (quoting *Stover v. O'Connell Assocs.,*

*Inc.*, 84 F.3d 132, 135-36 (4th Cir.1996)). Here, the applicable statutory provision is § 8.01-

328.1(A)(4), noting that specific jurisdiction is appropriate over a defendant

> (i) who causes tortious injury (ii) in Virginia (iii) by an act or omission outside of
> Virginia if that person (a) regularly does or solicits business in Virginia,
> (b) engages in any other persistent course of conduct in Virginia, or (c) derives
> substantial revenue from goods used or consumed or services rendered in
> Virginia.

---

[6] In Sections I and II of this Opinion, "Defendants" refers only to the corporate Defendants. Personal jurisdiction over Mr. Olligschläger will be addressed in Section III of the Opinion.

*Alitalia,* 128 F. Supp. 2d at 348. The basis of the Complaint is that Defendants are liable for a tortious injury, namely, trademark infringement. Plaintiff alleges that Defendants, although acting extra-domestically, used their domain names in a way that caused injury to Bright's REDTUBE mark here in Virginia. These allegations satisfy prongs (i), (ii), and a portion of prong (iii) of the statutory long-arm test—Plaintiff alleges that Defendants caused injury in Virginia by acts outside of Virginia.

The remaining issue is whether the Defendants' conduct constitutes either (a) regular business, (b) a persistent course of conduct, or (c) a source of substantial revenue. The nature of the Defendants' business relations and conduct are the focus of the constitutional analysis discussed *infra.* Because the Court concludes that these contacts satisfy the constitutional inquiry, and because Virginia's long-arm statute is intended to permit jurisdiction whenever the Constitution would do so, *see Young,* 315 F.3d at 261, the facts and circumstances before the Court are also sufficient to satisfy the Virginia statutory inquiry. The Defendants' contacts with Virginia subject them to jurisdiction in this forum.

### b. The Constitutional Prong: Purposeful Availment

The second part of the jurisdictional inquiry focuses on whether a court's exercise of jurisdiction comports with the due process limitations imposed by the United States Constitution. The constitutional inquiry is interested in determining whether the defendant has such "minimum contacts" with the forum that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice." *See Int'l Shoe Co. v. State of Wash., Office of Unemp't Comp. and Placement,* 326 U.S. 310, 316 (1945). To satisfy this test, the Defendants must have purposefully availed themselves in the forum; this "ensures that a defendant will not be haled

into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).

This cause of action does not present the first occasion on which a court has considered the personal jurisdiction analysis in the Internet context. Indeed, the Fourth Circuit adopted and adapted the well-known *Zippo* sliding scale test[7] in its *ALS Scan* opinion, stating:

> [W]e conclude that a State may, consistent with due process, exercise judicial power over a person outside of the State when that person (1) directs electronic activity into the State, (2) with the *manifested intent* of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts.

*ALS Scan*, 293 F.3d at 714 (emphasis added). The first and third prongs of the test are easily satisfied here. Plaintiff alleges that Defendants made direct Internet contacts with Virginia, and that these contacts violate, *inter alia*, trademark infringement and anticybersquatting laws. These causes of action are clearly recognized in this Court. The remaining prong of the *ALS Scan* test, prong (2), can be divided into two subparts: (i) did the Defendants engage in business or other interactions within the state, and (ii) did they do so with the manifested intent of engaging in such interactions? The Defendants clearly intended to engage in business; their website's purpose is to sell adult content for money. Consequently, the determinative issue is whether the Defendants *manifestly intended* to direct their business contacts into Virginia.

---

[7] The *Zippo* sliding scale test originated in the Western District of Pennsylvania, and is summarized as follows:

> At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise of personal jurisdiction. The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.

*Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119, 1124 (W.D. Pa. 1997) (internal citations omitted).

Although the original *Zippo* test focused on the "the nature and quality of commercial activity that an entity conducts over the Internet," *see Graduate Mgmt.*, 241 F. Supp. 2d at 594 (quoting *ALS Scan*, 293 F.3d at 713), the test from *ALS Scan* modifies the *Zippo* test by emphasizing the "requirement of *purposeful* targeting of a particular forum, **not just** the level of interactivity." *Graduate Mgmt.*, 241 F. Supp. 2d at 594 (italics in original, boldface added). To be sure, the Fourth Circuit test does not abandon the concern with the nature and quality of the commercial activity—this too serves as an indicium of purposeful availment. The *ALS Scan* test differs from the original *Zippo* model because *ALS Scan* highlights that a website's interactivity alone cannot satisfy the due process inquiry; instead the court must, from an elevated viewpoint, consider a defendant's "manifested intent" and purposeful targeting of the forum.

For example, in *Alitalia-Linee Aeree Italiane S.p.A. v. Casinoalitalia.com*, the defendant operated an online gambling website with 750 customers, five of whom were residents of Virginia. 128 F. Supp. 2d 340. Although the number of Virginia contacts was limited, the court found that the defendant was subject to personal jurisdiction in Virginia because the nature of the contact was ongoing and extensive. Though the *Alitalia* decision predates the Fourth Circuit's *ALS Scan* test, its holding is well-taken. Although the absolute number of contacts a business makes in a forum might be *de minimus*, when the defendant maintains an ongoing relationship with those contacts, the defendant should be put on notice that his actions could give rise to a lawsuit in the place where the contact transpires. Thus, it would be an unfair characterization to find that *Alitalia* looked only to the website's degree of interactivity. Rather, *Alitalia* considered whether the defendant had interacted with the Virginia contacts in way indicating that the exercise of personal jurisdiction comported with constitutional due process.

In the same vein, when the forum contacts are few, but the defendant's relationship with the contacts is not ongoing, though the website is one clearly involving business over the Internet (and thus likely to establish personal jurisdiction under the *Zippo* test), it is unlikely that constitutional due process would permit the exercise of personal jurisdiction as that concept is understood in *ALS Scan* and in a number of other jurisdictions.[8] A clear example of this concept can be found in *Graduate Management*. 241 F. Supp. 2d. 589. In that case, the owner of intellectual property rights relating to graduate school admissions test materials sued a foreign website operator for infringement. Customers ordered infringing materials on the website and the Defendant then shipped the materials to residents in Virginia.  The court determined that because there were only two Virginia contacts, and because the relationship with those contacts was discrete, the contacts were insufficient to put the defendant on notice that he could be haled into court in Virginia. Significantly, the court also noted that in some cases, the aggregate number of contacts could "support the conclusion that the defendant knowingly directed his activities into

---

[8] This concept is aptly explained it *Hy Cite Corp. v. Badbusinessbureau.com, L.L.C.*, where the court notes:

> [I]t is not clear why a website's level of interactivity should be determinative on the issue of personal jurisdiction. As even courts adopting the *Zippo* test have recognized, a court cannot determine whether personal jurisdiction is appropriate simply by deciding whether a website is "passive" or "interactive" (assuming that websites can be readily classified into one category or the other). Even a "passive" website may support a finding of jurisdiction if the defendant used its website intentionally to harm the plaintiff in the forum state. *See Panavision Int'l, LP v. Toeppen,* 141 F.3d 1316, 1322 (9th Cir.1998). Similarly, an "interactive" or commercial website may not be sufficient to support jurisdiction if it is not aimed at residents in the forum state. *See GTE New Media Servs., Inc. v. BellSouth Corp.,* 199 F.3d 1343, 1349-50 (D.C. Cir. 2000). Moreover, regardless how interactive a website is, it cannot form the basis for personal jurisdiction unless a nexus exists between the website and the cause of action or unless the contacts through the website are so substantial that they may be considered "systematic and continuous" for the purpose of general jurisdiction. Thus, a rigid adherence to the *Zippo* test is likely to lead to erroneous results.

297 F. Supp. 2d 1154, 1160 (W.D. Wis. 2004).

the forum," but due to the limited contacts in *Graduate Management*, such was not the case there. 241 F. Supp. 2d. at 598 n.17.

Even though jurisdiction was unavailable in *Graduate Management* under Federal Rule of Civil Procedure 4(k)(1), the court went on to find jurisdiction over the defendant under Rule 4(k)(2). The distinction between Rule 4(k)(1) and (2) is, in effect, only a change in the relevant forum. Under Rule 4(k)(1) the relevant forum is a state within the United States. Under Rule 4(k)(2) the forum is the United States as a whole.[9] Although the number of contacts on a national scale remained unaltered in absolute terms (the two Virginia contacts were also the only contacts in the United States as a whole), the court found that the focus of the website showed "ample evidence that [the defendant] targeted the United States market." *See Graduate Mgmt.*, 241 F. Supp. 2d at 598; *see also Young*, 315 F.3d at 263 (analyzing the "general thrust and content" of the contact). In *Graduate Management*, the court found that the website targeted the United States because the defendant provided specific ordering information for United States customers, and he provided the information first and with more specificity than for other countries; he specifically highlighted the United States as a place of delivery; he listed the price for his products in dollars; he provided customer testimonials, half of which were from United States citizens; he promoted the value of his product to American citizens in particular; and of course, he shipped materials to two United States customers. The court concluded these factors satisfied the *ALS Scan* test—the defendant "directed his electronic activity into the United States with the manifest intent of engaging in business within the United States." *Graduate Mgmt.*, 241 F. Supp. 2d at 599 (citing *ALS Scan*, 293 F.3d at 714) (internal quotations and brackets omitted).

---

[9] The distinction between 4(k)(1) and 4(k)(2) will be discussed at length *infra*. At this time, it is only necessary to understand that jurisdiction is only a possibility under 4(k)(2) when the defendant's contacts with a single state are insufficient, but the contacts with the United States as a whole are sufficient, to comport with the constitutional notions of due process. *See Graduate Mgmt.*, 241 F. Supp. 2d at 597.

Keeping in mind that the broadest inquiry is whether the Defendants expressed a manifest intent to target the forum, the preceding cases illustrate the following "general framework" of factors to consider in determining whether such an intent exists:

Factor 1.    The Quantity of the Contacts: A significant number of contacts within the forum might indicate the necessary manifested intent. *See Graduate Mgmt.*, 241 F. Supp. 2d. at 598 n.17.

Factor 2.    The Quality of the Contacts: A continuous and ongoing relationship, even with relatively few contacts, could be sufficient to indicate a manifest intent to target the forum. *See Alitalia*, 128 F. Supp. 2d 340.

Factor 3.    Overall focus of activity: The general thrust and content of the website and the overall focus of the website as a whole could confirm the defendant's manifested intent to target the forum. *See Graduate Mgmt.*, 241 F. Supp. 2d at 598; *see also Young*, 315 F.3d at 263.

Of course, this list is not exhaustive. Given a different set of circumstances, other factors could either contribute to, or detract from, the possibility that the defendant should be subject to jurisdiction. And again, to be clear, the proper focus is on the defendant's manifested intent to target the forum. *See ALS Scan*, 293 F.3d at 714; *Young*, 315 F.3d at 263 (noting that the defendants must "manifest an intent to target and focus on Virginia . . ."). None of the factors listed above can substitute as the proper focus; their purpose is to assist in determining whether the Defendants displayed the requisite intent.

Applying this framework to the facts at hand, it is first necessary to consider the number of contacts the Defendants made in Virginia. Sixteen of the 1.8 million registered users provided a Virginia zip code, and these sixteen users provided €1620 of €8.1 million in revenue through

56 separate transactions. There are no additional contacts with amateurs or affiliate webmasters in Virginia. Although these numbers might seem trivial in relative terms, when viewed as an absolute value, sixteen contacts is certainly not insignificant. The *di minimus* proportionate number of contacts only indicates the vast size of the Defendants' business. It does not render the numerous contacts within Virginia any less significant. But, even if sixteen contacts with the forum were insufficient to establish personal jurisdiction over the Defendant, this number, coupled with the quality of those contacts satisfies the jurisdictional test.

Here, Defendants maintained an ongoing relationship with its registered users. Users are required to agree to Terms and Conditions and purchase coins in order to view content on Defendants' website. After a user pays for the content, the website stores the content for the user, where the user has permanent online access to the video. Thus, continuous use of the purchase would necessitate an ongoing interaction between the users and the Defendants' website. The Defendants also reach out to registered users in Virginia by providing free "bonus" coins to encourage continued interaction with their website. Additionally, Defendants send periodic emails to registered users, fostering an ongoing relationship between the Defendants and Virginians, and all except one of the sample emails provided to the Court were written in English. The nature of these contacts is sufficient to put the Defendants on notice that they could be haled into court in this forum. *See Alitalia*, 128 F. Supp. 2d at 350 (finding jurisdiction when five of 750 users provided Virginia addresses on an online gambling website; the users engaged in real-time interactivity on the site and were required to purchase credits).

As to the final prong of the jurisdictional framework, there is nothing unique about the website's focus that indicates a manifested intent to do business in Virginia. There are also no additional factors absent from the "general framework" outlined above that warrant

consideration here. Though it is certainly a close call, the Court finds that the Plaintiffs have established by a preponderance of the evidence that the number and nature of contacts are sufficient to establish jurisdiction.

## II.  Even if jurisdiction were improper in Virginia, it would be proper in the United States.

When a defendant's contacts with a single state are insufficient to establish personal jurisdiction within that state, but the defendant's contacts with the United States as a whole are sufficient to establish jurisdiction, any state within the United States may exercise jurisdiction over the defendant under Rule 4(k)(2). This Rule permits jurisdiction when (i) a claim arises under federal law, (ii) the defendant is not subject to jurisdiction in any state court, and (iii) exercising jurisdiction does not offend the constitution or laws of the United States. *See* Fed. R. Civ. P. 4(k)(2).

The first element is clearly satisfied. Six of the nine counts in the complaint arise under federal law.[10] Because the second prong of this analysis indicates that jurisdiction under 4(k)(2) is only appropriate when the defendant is not subject to jurisdiction in any one state, Sections I and II of this Opinion should be read as alternative holdings. In other words, if jurisdiction is appropriate in Virginia under 4(k)(1), there is no jurisdiction under 4(k)(2). However, if the

---

[10] Count I: Violation of Anti-Cybersquatting Consumer Protection Act,15 U.S.C. § 1125(d); Count II: Trademark Infringement, 15 U.S.C. §1114(1); Count III: Trademark Infringement, 15 U.S.C. § 1125(a); Count IV: False Advertising, False Designation of Origin and Unfair Competition, 15 U.S.C. § 1125(a); Count V: Trademark Dilution, 15 U.S.C. §1125(c); Count VI: Common Law Trademark Infringement and Unfair Competition; Count VII: Civil Conspiracy in Violation of Virginia Common Law; Count VIII: Civil Conspiracy in Violation of Virginia Code §§ 18.2-499 and 500; Count IX: *In Rem* Action Under the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)(2).

Defendants are not subject to jurisdiction in Virginia, this court's jurisdiction under 4(k)(2) would apply.[11]

The remaining element "requires the same minimum contacts due process analysis as is conducted under Rule 4(k)(1)." *Graduate Mgmt.*, 241 F. Supp. 2d at 597. The only distinction is the relevant forum. Instead of applying the three-factor general framework to the Defendants' contacts with Virginia, the Court will instead consider the Defendants' contacts with the United States as a whole—analyzing the quantity and the quality of the contacts, as well as the overall focus of the website on the United States forum.

The aggregate number of contacts within the United States adds support to the exercise of jurisdiction within the United States. While only sixteen of the users provided Virginia addresses, 577 registered users provided addresses within the United States. These users contributed €64,470 in revenue through 2,002 separate transactions. Again, the Court finds it appropriate to focus on the absolute number of contacts rather than the proportionate number of contacts. Additionally, though there were no amateurs or affiliates in Virginia, there are five amateurs and one affiliate in the United States. These amateurs uploaded 129 videos, which have been sold approximately 4,800 times, and earned approximately €25,813 in revenue.

The quality of the contacts on a national scale is the same as it was for those contacts located in Virginia. At the national level, however, the Defendants also made contact with amateurs and an affiliate. The quality of contact with the amateurs in particular is much more significant than the quality of the contacts with the registered users. Amateurs provide

---

[11] To find jurisdiction under 4(k)(2), the Court need find that jurisdiction is inappropriate not only in Virginia, but also that jurisdiction would be inappropriate in any of the states. The Court finds that there are no factors distinguishing other states from Virginia which would make jurisdiction appropriate under 4(k)(1) in a different forum. The only distinction between Defendants' contacts in Virginia and any of the other states is in Nevada, where the owner of the one and only affiliate website located within the United States can be found. This affiliate received payments to bank accounts located in Germany and Spain, and never in the United States. Standing alone, this additional contact is not outcome determinative. Thus, jurisdiction is just as proper, or improper, in Virginia as it would be in any state where Defendants made an adequate number of contacts with registered users.

Defendants with the very material that Defendants ultimately post on their website for profit. Amateurs receive payments on a monthly basis, necessitating repeated interaction with the Defendants. The quality of contact that the Defendants have with the registered users, coupled with the quality of contact Defendants have with the amateurs is more than sufficient to establish the Defendants' manifested intent to purposefully avail themselves of the United States markets, and consequently, the United States as a forum for adjudication.

Finally, the Court considers the focus of the Defendants' website. This factor counsels against jurisdiction in the United States. Although portions of the website's layout can be translated into English, most of the website's content is provided only in German. Registered users and affiliates are required to agree to Terms and Conditions which are provided only in German, and not translated. The exchange rate for the website's "coin" currency is provided in Euros and is not converted into dollars. Although Defendants offer affiliates a variety of English banner advertisements, Defendants do not mandate or monitor the use of those banners. It seems fairly clear that the focus of the website is not on the United States.

Nevertheless, the website's focus is not determinative. The significant number of contacts coupled with the nature of those contacts outweighs the website's non-domestic focus in favor of exercising jurisdiction. Again, the question is close, but in a world where the economic significance of international borders is on the decline, red-tube.com's use of the German language and denomination in Euros would likely not provide a substantial barrier to United States users. The nature of the website's content suggests that a user need only appreciate its aesthetical aspects. Language comprehension is not critical to the entertainment value; thus, the fact that a user only understands English would not likely be prohibitive. Moreover, even though the prices on the website are demarcated in Euros, users could easily find an online conversion

tool with only a few clicks. Though the website's focus in not on the United States, this inquiry alone cannot prevent the exercise of jurisdiction when the Defendants so manifestly intended to profit from United States citizens and the website's focus did not substantially impede the Defendants' ability to profit from citizens in this forum.

Assuming jurisdiction is improper under 4(k)(1), the Court finds that, in the alternative, jurisdiction would be proper under 4(k)(2).

### III.   The Court has personal jurisdiction over Olligschläger.

Defendant Olligschläger argues that even if jurisdiction is appropriate over the corporations, the exercise of jurisdiction over him would be improper because he has had no contact with the United States. Plaintiff alleges two bases for exercising jurisdiction over Olligschläger. First, Plaintiff contends that a corporate officer can be held personally liable for trademark infringement when the officer is directly involved in the violation. Second, Plaintiff argues that jurisdiction is proper over Olligschläger because he is an alter ego of the corporate Defendants.

#### a.   Olligschläger is personally liable for the torts he committed in the Commonwealth.

A corporate official may be held personally liable in trademark infringement cases "for tortious conduct committed by him, though committed primarily for the benefit of the corporation." *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 149 (4th Cir. 1987); *Stafford Urgent Care, Inc. v. Garrisonville Urgent Care, P.C.*, 224 F. Supp. 2d 1062, 1065-66 (E.D. Va. 2002) ("[I]t is equally well-established that an individual corporate officer or director can be held personally liable for trademark infringement."). The non-resident officer shares liability and is subject to jurisdiction along with the corporation when the officer has "direct involvement in the

infringing activities of the corporation." *AARP v. Am. Family Prepaid Legal Corp., Inc.*, 604 F. Supp. 2d 785, 800 (M.D.N.C. 2009) (quoting *Musselwhite v. Int'l Learning Works, Inc.*, No. 2:97CV460, 1997 WL 34588522, at *2 (M.D.N.C. Oct. 17, 1997)); *see also Stafford Urgent Care*, 224 F. Supp. 2d at 1066 (citing with approval the Third Circuit's *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir.1978) opinion, which found that a corporate officer could be found liable for acts of trademark infringement that he had authorized and approved). However, "[i]f a director does not personally participate in the corporation's tort, general corporation law does not subject him to liability simply by virtue of his office." *Tillman v. Wheaton-Haven Recreation Ass'n, Inc.*, 517 F.2d 1141, 1144 (4th Cir. 1975).

Defendants argue that even though a corporate officer may be held jointly liable with the corporation for tortious activity, establishing personal jurisdiction over Olligschläger is a separate inquiry. Defendants contend that Olligschläger must himself have minimum contacts with the forum to be subject to jurisdiction here, and that the jurisdictional contacts of a corporation cannot be imputed to an officer unless the corporate veil is pierced. But Defendants confuse the issue. Plaintiff's allegations are that Olligschläger led the corporate charge in committing the tortious conduct in Virginia and the United States. Thus, it is Olligschläger's own infringing actions that form the predicate for the exercise of jurisdiction.

The Fourth Circuit addressed the distinction between jurisdiction and liability in *Columbia Briargate Co. v. First Nat'l Bank in Dallas*, 713 F.2d 1052 (4th Cir. 1983). There, the plaintiff sued both a defendant bank and its vice-president under the South Carolina long-arm statute. The cause of action was based on alleged fraudulent statements the vice-president made while negotiating the sale of apartment buildings on behalf the bank. The vice-president made the alleged fraudulent statements while in South Carolina. The Fourth Circuit affirmed the

district court's exercise of jurisdiction, finding the fact that the vice-president was acting in a corporate capacity could not shield him from jurisdiction in South Carolina when he came in to the forum State and made fraudulent misrepresentations.

The Fourth Circuit went on to discuss the distinction between the substantive liability of a non-resident agent-defendant, such as a corporate officer, and that officer's amenability to jurisdiction under a state's long-arm statute. Though the question before this Court is somewhat distinct from the question before the Fourth Circuit, the Fourth Circuit's analysis addressed, at least implicitly, the facts as they exist in the case at bar. The distinction between this case and *Columbia Briargate* is that here, the individual Defendant's act occurred outside of Virginia, rather than within the forum.

The *Columbia Briargate* opinion briefly summarized and analyzed a variety of other opinions speaking to this issue. The Fourth Circuit found persuasive the reasoning in the *Idaho Potato* opinion. *See Idaho Potato Com'n. v. Wash. Potato Com'n.*, 410 F. Supp. 171 (D. Idaho 1976). There, the court held that non-resident corporate agents were not subject to personal jurisdiction when their only relation to the forum was that they approved an advertising plan which was disseminated in the forum and which infringed the plaintiff's trademark. *Id.* at 182. The Fourth Circuit noted of the *Idaho Potato* opinion, that

> [i]t [the opinion] found that it was proper under the principles of "fair play" and "substantial justice" "to hold that a corporation which engages in activities having [foreseeable] ramifications beyond the state in which it is physically present may have sufficient connection [or "contacts"] with a distant forum where the ramifications are felt" but that "it is quite another matter to hold that an individual working for that same corporation, who has never been present in the distant forum with regard to a corporate transaction, *[and has no reason to foresee responsibility in the forum state]* has a similar connection [or "contacts"] with the distant forum."

*Columbia Briargate Co.*, 713 F.2d at 1060-61 (brackets in original, italics added). The bracketed language added by the Fourth Circuit is significant. It indicates that the Fourth Circuit anticipated the facts of the present case, where though the Defendant has never been in the forum state, he had reason to foresee responsibility in the forum state based on his actions. Indeed, the Fourth Circuit went on to characterize the reasoning in *Idaho Potato* by noting,

> If the agent has never been in the forum state *and has had no "causal connection" with the alleged tort* and has no reason to foresee being made amenable to suit therein, it would be unfair to require him to come to such state to defend a tortious act *not participated in by him* in that state but that same reasoning would not apply to a corporation carrying on an interstate business whose tortious conduct had had a harmful result in the state.

*Id.* at 1061 (emphasis added).

Importantly, the Fourth Circuit also found that the *Idaho Potato* opinion was consistent with *Escude Cruz v. Ortho Pharmaceutical Corp.*, 619 F.2d 902 (1st Cir. 1980). In *Ortho*, like the present case, the defendants' tortious conduct took place outside of the forum. There, the plaintiff brought a workplace personal injury action in Puerto Rico against the officers and directors of his place of employment, all of whom were residents of New Jersey. Seven of the corporate officer defendants, save one, had no connection with Puerto Rico other than in their corporate capacities. The one exception included a director who exercised operational control over the plaintiff employee's workplace. The plaintiff claimed that the defendants should each be subject to jurisdiction in Puerto Rico due to their alleged tortious acts which caused harm within the forum.[12] The First Circuit found, that in order for jurisdiction to attach, it would be necessary for the plaintiff to show some

> direct personal involvement by the corporate officer in some decision or action which is causally related to plaintiff's injury.

---

[12] The Court also noted that "no jurisdictional facts were adduced to show that the injury was caused by acts of the defendants committed outside of Puerto Rico." *Id.* at 908.

* * *

> [M]erely being an officer or agent of a corporation does not render one personally liable for a tortious act of the corporation. Specific direction or sanction of, or active participation or cooperation in, a positively wrongful act of commission or omission which operates to the injury or prejudice of the complaining party is necessary to generate individual liability in damages of an officer or agent of a corporation for the tort of the corporation.

*Id.* at 907 (citing *Lobato v. Pay Less Drug Stores*, 261 F.2d 406, 408-09 (10th Cir. 1958); *Tillman*, 517 F.2d at 1143-44; *Hagemeyer Chem. Co. v. Insect-O-Lite Co.*, 291 F.2d 696, 699 (6th Cir. 1961) (per curiam )); 3A Fletcher Cyc. Corp. § 1137 (1975)). The First Circuit found that jurisdiction was improper over six of the seven officers because they had no involvement with the plaintiff's workplace on an operational level—thus, they could not have participated in the tortious conduct. The court also found that the allegations were insufficient to exercise jurisdiction over the seventh officer because the plaintiff failed to show that the officer personally participated in any of the conduct that harmed the plaintiff.

After "canvassing the reasoning of the various courts" discussing the present issue, the Fourth Circuit settled on the following rule:

> [W]e are persuaded that when a non-resident corporate agent is sued for a tort committed by him in his corporate capacity in the forum state in which service is made upon him without the forum under the applicable state long-arm statute as authorized by Rule 4(e), he is properly subject to the jurisdiction of the forum court, *provided the long-arm statute of the forum state is co-extensive with the full reach of due process.* On the other hand, *if the claim against the corporate agent rests on nothing more than that he is an officer or employee of the non-resident corporation* and if any connection he had with the commission of the tort occurred without the forum state, we agree that, under sound due process principles, the nexus between the corporate agent and the forum state is too tenuous to support jurisdiction over the agent personally by reason of service under the long-arm statute of the forum state.

*Columbia Briargate*, 713 F.2d at 1064-65 (emphasis added). At first blush, it might appear that this rule prevents the exercise of jurisdiction over Olligschläger. However, the claim against

Olligschläger is not based only on his role as a corporate officer. Unlike the corporate defendants in *Ortho*, the Plaintiff here alleges that Olligschläger's personal actions are the direct cause of the tortious conduct. The evidence shows that Olligschläger registered a redtube-testaccount.com and that he personally performed the infringing activities or directed them. Olligschläger identified his responsibilities at Swiss Media as "[f]inances, taking care of the amateurs, the webmaster and the affiliates, development and design and creation of the marketing plans and management of provision of services," as well as determining what domain names to register and use in the operations of Swiss Media. Olligschläger Dep., 75:22-76:9, Feb. 14. 2012, ECF No. 119-2, Ex. A. He confirmed that he is the only individual authorized to enter into agreements with service providers and to direct payments made on behalf of Swiss Media. *Id.* at 76:14-23.

In sum, Olligschläger's deposition makes clear that he is directly responsible for all substantive decisions related to the operation of the websites at the infringing domains. Even if compliance with corporate formalities prevents piercing the corporate veil,[13] Olligschläger was directly involved in and responsible for decisions that Plaintiff alleges amount to tortious conduct. Olligschläger "is not immune from jurisdiction in Virginia merely because [his] contacts with the Commonwealth were made ostensibly on behalf of [the corporate Defendants]." *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 177 (4th Cir. 2002) (citing *Calder v. Jones*, 465 U.S. 783, 790 (1984)). Nor can Olligschläger avoid jurisdiction simply because he committed these acts abroad. His actions had a direct causal connection with the alleged tort, and he, just as the corporate Defendants, should have foreseen that these actions were sufficient to subject him to accountability in this forum. *See Columbia Briargate*, 713 F.2d at 1060-61.

---

[13] However, as the Court addresses *infra* in Part III.b., it is appropriate to pierce the veil here.

Because Olligschläger's actions were so directly connected to the alleged tortious conduct, it is not necessary that he step foot in Virginia or the United States so as not to offend the traditional notions of fair play and substantial justice inherent in our Constitution's Due Process Clause.[14] Quite the contrary, it would offend substantial justice to permit an individual, who so clearly causes harm in this forum, to avoid accountability here simply because he conducted his affairs abroad. It is the ever evolving nature of technology that makes it possible for a foreign defendant to so directly impact the United States, and it is fortunate that the Fourth Circuit had the foresight, even in 1983, to create a framework applicable to a set of circumstances where a defendant, though not present in the forum, has a direct and unmistakable connection to the offensive conduct. This is the case here, and it would be illogical to permit jurisdiction over a corporation for a tortious act committed abroad but which caused harm here, and at the same time allow the individual allegedly responsible for each of the injurious decisions to escape the grasps of this Court's judicial authority. This Court finds it consistent with the Fourth Circuit's reasoning, with the reasoning in *Ortho*, and most importantly with the Due Process clause, that when a corporate officer is directly, rather than tenuously, involved in tortious conduct, the officer may be personally subject to jurisdiction in the forum even when his actions occurred outside the forum.

This is not to say that a corporate officer should be held accountable for any act a corporation commits in a foreign forum. For example, if Agent A in Corporation C's marketing

---

[14] "The [due process] test established [by the Supreme Court] requires sufficient minimum contacts of the non-resident with the forum state as not to offend traditional notions of fair play and substantial justice by providing a sufficient connection between the non-resident defendant and the forum State to make it fair to require defense of the action in the forum." *Columbia Briargate*, 713 F.2d at 1057 (internal brackets and quotations omitted) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291-92 (1980); *Kulko v. Superior Court of Cal. In and For City and Cnty. of San Francisco*, 436 U.S. 84, 91 (1978)). This is the same due process analysis that the Court applied to the corporate Defendants *supra*. Because Defendant Olligschläger's actions are coextensive and indistinguishable from the actions of the corporate Defendants, Olligschläger's actions cannot offend due process any more than could the actions of the corporate Defendants. Accordingly, the Court finds that the due process limitations are satisfied.

department engaged in tortious acts in Virginia (either abroad or while directly in the state), the CFO of Corporation C could not be haled into court in Virginia because his actions would have, at most, a tenuous connection to the offensive conduct. But when Agent A's acts directly contributed to the tortious conduct, it would not offend the Due Process Clause to find that A could have reasonably foreseen that her conduct would subject her to jurisdiction here.

The evidence before the court establishes by a preponderance that jurisdiction over Olligschläger is appropriate. Olligschläger was the individual responsible for each of the corporate decisions in this instance, and just as jurisdiction exists over the corporations, jurisdiction over Olligschläger also comports with traditional notions of fair play and substantial justice. *See World-Wide Volkswagen*, 444 U.S. at 291-92.

### b. Olligschläger is subject to personal jurisdiction because he is an alter ego of the corporate Defendants.

Plaintiff also argues that even if Olligschläger is not subject to jurisdiction based on his personal liability for the underlying tortious activity, he is subject to jurisdiction because he is an alter ego of the corporate Defendants. A court may pierce the corporate veil, and consistent with due process, exercise jurisdiction over an individual who otherwise would not be subject to the personal jurisdiction of the court, if the individual is an alter ego of a corporation that is subject to the court's jurisdiction. *See Newport News Holdings Corp. v. Virtual City Vision, Inc.*, 650 F.3d 423, 433 (4th Cir. 2011) (quoting *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 n.18 (5th Cir. 2002)). Virginia law permits veil-piercing when an individual is actually an alter ego of a corporation. This is the case when there is "(i) a unity of interest and ownership between [the individual and the corporation], and (ii) that [individual] used the corporation to evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an

unfair advantage." *Id.* at 434 (quoting *C.F. Trust, Inc. v. First Flight Ltd. P'ship*, 306 F.3d 126, 132 (4th Cir.2002)).

The plaintiff in *Newport News*, as here, accused the defendant of using an internet domain name in a way that infringed the plaintiff's trademark. This wrongdoing sufficiently met the second prong of the analysis, in that the defendant "used [the company] to commit an injustice." Thus the relevant issue before the Court is whether a unity of interest exists between Olligschläger and a corporate Defendant.[15] In *Newport News*, the following factors caused the court to answer the unity of interest question in the affirmative:

> VCV [the corporate defendant] had no separate identity from Tran [VCV's owner]. . . . Tran is the President of VCV, Tran is the sole employee of VCV, and Tran is the only participating member of VCV's Board of Directors. . . . Additionally, Tran admits that VCV's business is conducted out of his home and Tran is the only board member invited to, and present at, meetings of the VCV Board of Directors. . . . It is Tran, and Tran alone, who is responsible for the decisions and actions of VCV . . . and it would present a manifest injustice if Tran were now allowed to hide behind a non-existent corporate veil to avoid personal liability for his actions. There is a unity of interest and ownership between Tran and VCV, and Tran controlled and used VCV to commit an injustice.

*Id.* at 434 (citing the district court opinion).

Again, the evidence shows that Olligschläger is the managing director and sole shareholder of Swiss Media. Swiss Media has no board of directors and has held no shareholder meetings, as required by Swiss law. *See* Swiss Code of Obligations, Tit. 28, Sec. 3, Art. 805,

---

[15] Defendants cite *International Bancorp* and suggest that the present facts are insufficient to pass the stringent standard for piercing the corporate veil in Virginia. *See Int'l Bancorp, L.L.C. v. Societe Des Bains De Mer Et Du Cercle Des Etrangers a Manaco*, 192 F. Supp. 2d 467, 478 (E.D. Va. 2002) (citing *Cheatle v. Rudd's Swimming Pool Supply Co., Inc.*, 360 S.E.2d 828, 831 (Va. 1987)). However, "[t]here is no single rule or criterion that can be applied to determine whether piercing the corporate veil is justified," and given the similarities between the facts in this case and those present in the Fourth Circuit's *Newport News* opinion, the Court is persuaded that piercing the corporate veil to impose jurisdiction is appropriate here. *See also O'Hazza v. Executive Credit Corp.*, 431 S.E.2d 318, 320 (Va. 1993) ("The cases and commentators generally agree, however, that one who seeks to disregard the corporate entity must show that the shareholder sought to be held personally liable has controlled or used the corporation to evade a personal obligation, to perpetrate fraud or a crime, *to commit an injustice*, or to gain an unfair advantage.") (emphasis added).

para. 2, status as of Mar. 1, 2012, ECF No. 119-2, Ex. QQ. Olligschläger founded Swiss Media to take over the operation of the red-tube domains from RT MediaSolutions. Olligschläger Dep. at 83:24-84:16. By acting as "managing director on both sides" of RT MediaSolutions and Swiss Media, he allowed Swiss Media to use RT MediaSolutions' REDTUBE trademark rights without any formal licensing agreement, and to use videos that were licensed to RT MediaSolutions without any formal transfer of those rights to Swiss Media. *Id.* at 57:3-60:24, 67:25-68:15. Olligschläger sets his own income at the statutory maximum and approves, at his own discretion, additional compensation by submitting separate invoices. *Id.* at 91:17-92:17.

The facts and circumstances of this case are strikingly similar to those analyzed in the Fourth Circuit's *Newport News* opinion. As in that opinion, here too "[t]here is a unity of interest and ownership between [Olligschläger] and [Swiss Media], and [Olligschläger] controlled and used [Swiss Media] to commit an injustice." *Newport News*, 650 F.3d at 434. In short, Olligschläger is an alter ego of Swiss Media, and this court's exercise of jurisdiction over him is appropriate on that basis.

## CONCLUSION

For these reasons, the Court finds that the exercise of personal jurisdiction is appropriate over each of the Defendants. Defendants' Motion to Dismiss is DENIED.

An appropriate Order shall issue.

May 18, 2012
Alexandria, Virginia

/s/ Log
Liam O'Grady
United States District Judge